UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION


                            - - -

UNITED STATES OF AMERICA,      .  Case Number 1:15-cr-118
                               .
              Plaintiff,       .
                               .  *Sentencing*
                               .
         - v -                 .
                               .  Wednesday, February 28, 2018
CODY LEE JACKSON,              .  2:30  p.m.
                               .
              Defendant.       .  Cincinnati, Ohio
. . . . . . . . . . . . . .

                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MICHAEL R. BARRETT


For the Plaintiff:

CHRISTY L. MUNCY, ESQ. (AUSA)
United States Attorney's Office
221 East Fourth Street, Suite 400
Cincinnati, Ohio  45202

For the Defendant:

CANDACE C. CROUSE, ESQ.
Pinales Stachler Young Burrell & Crouse
455 Delta Avenue, Suite 105
Cincinnati, Ohio  45226

STEPHEN J. WENKE, ESQ.
36 East Seventh Street, Suite 2020
Cincinnati, Ohio  45253


Also Present:          F.B.I. Special Agent Pamela S. Kirschner
                       Officer Beth Roach, Blue Ash Police Dept.
                       Laura Jensen, U.S. Probation Officer


Courtroom Deputy:   Barbara A. Crum


Court Reporter:     Maryann T. Maffia, RDR

1          **P R O C E E D I N G S**

2          **COURTROOM DEPUTY:** On the docket is District Court

3    Case Number 1:15-cr-118: *United States of America versus Cody*

4    *Lee Jackson.*

5        And we are here for sentencing.

6          **THE COURT:** Counsel want to enter their appearances

7    for the record, please.

8          **MS. MUNCY:** Good afternoon, Your Honor. Christy

9    Muncy on behalf of the United States. Also seated at counsel

10   table is Special Agent Pamela Kirschner with the F.B.I. and

11   Detective Beth Roach with the Blue Ash Police Department.

12         **MS. CROUSE:** Good afternoon, Your Honor. Candace

13   Crouse on behalf of Cody Jackson.

14         **MR. WENKE:** Steve Wenke for Mr. Jackson.

15         **THE COURT:** Okay. So let's just review how we got to

16   where we are and then get on with the proceedings.

17       So Cody, you were in front of me on May 5th of last year,

18   2017. You entered a plea of guilty to Coercion and

19   Enticement, violations of 18 U.S.C. 2422. It was the first

20   count of the Indictment.

21       The PSI was originally prepared on August 25th of last

22   year later, later revised December 21st of last year as well.

23       At the time we handled the plea and I accepted the plea

24   and made a finding of guilty, I told you I would review the

25   PSI to see if I agreed with the 11(c)(1)(C) recommendation and

1    the recommendation --

2        Correct me, counsel, if I'm wrong.  The recommendation was

3    a range from 120 to 180 months concurrent with state time.  Is

4    that correct?

5            MS. MUNCY:  That's correct, Your Honor.

6            THE COURT:  Okay.  The recommendation is fine with

7    me, so we're ready to proceed with the sentencing.  Fair

8    enough?

9            MS. MUNCY:  Yes, sir.

10           THE COURT:  Okay.  All right.  I've received a copy

11   of the memorandum that was filed by Candace and Steve, as well

12   as the one filed by Christy.

13       So counsel, have you guys received a copy of everything

14   and discussed it with Cody?

15           MS. CROUSE:  Yes, Your Honor.

16           THE COURT:  Christy, have you received a copy of

17   everything and discussed it with anybody that you had to?

18           MS. MUNCY:  Yes, Your Honor.

19           THE COURT:  All right.  Let's go over the offense

20   level calculation just for the record.

21       So the Base Offense Level for a violation of 18 U.S.C.

22   2422(b) is at Guideline 2G1.3 and the subsection thereafter,

23   and the Base Offense Level for this is a 28.

24       Since there was use of an electronic media or computer in

25   this situation, there is a two-level enhancement.

Because there was also the commission of sexual contact or sexual act, there is an additional two-level enhancement.

So the Base Offense Level is then figured to a 32.

Since the offense involved a minor who was between the ages of 12 and 16, there is a two-level enhancement.

Because of the commission of the actual sexual act itself, there is an additional two-level enhancement.

And if for the purpose of producing sexually explicit material or transmitting the material, the offense again involved the use of a computer. In this situation, there was Facebook that was used as part of the enticement elements of the offense, so there is another two-level enhancement.

There is also enhancement because it's alleged that Cody attempted to prevent testimony from the victim.

So the Adjusted Offense Level is a 40.

There is a five-level enhancement under Chapter Four, 4B1.5(b) in which the defendant's offense is a covered sex crime. Then there is a five-level enhancement. The instant offense is a covered sex crime because it was perpetrated against a minor, Chapter 117 of Title 18 of the Code.

Cody also engaged in prohibited sexual contact with a minor on at least two separate occasions, so he got a five-level enhancement for that.

Then for acceptance of responsibility and timely notification, the Adjusted Total Level Offense level is 42.

His Criminal History is a III.

A guideline calculated sentence absent the 11(c)1(C) agreement his lawyers reached with the United States would have been a guideline sentence of anywhere from 360 months to life.

I've already indicated I would accept the 11(c)1(C) sentencing range.

For the record, the recommended sentence by the Probation Department is 165 months.

Are there any facts in the PSI that are disputed, Candace or Steve?

MS. CROUSE:  No, Your Honor.

THE COURT:  Same question to you, Christy.

MS. MUNCY:  No, Your Honor.

THE COURT:  Any facts that Candace or Steve feel need to be included in the PSI?

MS. CROUSE:  No, Your Honor.

THE COURT:  Same question to you, Christy.

MS. MUNCY:  No, Your Honor.

THE COURT:  Are there any objections that need to be addressed at this time before we actually move into my findings of fact and the sentencing phase?

MS. CROUSE:  None from the defendant.

MS. MUNCY:  No objections, Your Honor.

THE COURT:  Okay.  That being the case, the Court

finds that Cody has entered a valid plea to Count 1 of the Indictment in Case Number 1:15-cr-118, Coercion and Enticement, a Class A felony. It's a violation of 18 U.S.C. 2422.

As I explained at the time of the plea, he was subjected to a mandatory minimum of ten and a possible sentence of up to life.

We've already talked about what the calculation would have resulted in, that is 360 to life; a possible $250,000 fine; supervised release of at least five years, possibly for the remainder of his life; and there is a 100-dollar special assessment.

Before we proceed to the sentencing phase, are there any objections or facts that need to be explained at this time?

MS. CROUSE:  No, Your Honor.

MS. MUNCY:  No, Your Honor.

THE COURT:  Okay.  That being the case, Candace and Steve, is there anything that either of you wish to say in anticipation and/or mitigation of a possible sentence for Cody?  And if there is anything Cody needs to say, his chance would be after you guys have spoken.  Fair enough?

MS. CROUSE:  Your Honor, before we begin, I believe that Cody's father would like to address the Court, and then we'll proceed with our arguments in mitigation.

THE COURT:  Okay.  Has he been cautioned not to use

1    the name of any minors?

2            MR. WENKE:  Yes.

3            THE COURT:  All right.  Is he here?

4            MS. CROUSE:  Yes.

5            THE COURT:  Where is he?

6       Sir, I understand you want to say a few things for the

7    record, which means -- when we say "for the record," that

8    means our court reporter is taking it down, so you have to

9    speak slowly enough so that she can understand what you're

10   saying.  But if you could begin by stating your name and

11   spelling your last name so she can take it down, that would be

12   great.

13           MR. ARGIL JACKSON:  Yes.  My name is Argil Jackson,

14   A-r-g-i-l.  Last name is Jackson, J-a-c-k-s-o-n.

15           THE COURT:  Okay.  Thank you.  Go ahead.

16           MR. ARGIL JACKSON:  I'm Cody's father.  I know my son

17   is going to prison for a long time, at least ten years.  He

18   pled guilty.  I want you to know that I am 73 years old and

19   recovering from lung canner.  I was 50 when he was born.  He

20   lived with his mother.  I tried everything I could to protect

21   him, but I know he was abused a lot when he was there.  She

22   lived with a registered sex offender, among other things, and

23   he went through extreme emotional and physical abuse when he

24   was there.

25      This is not an excuse for anything he has done, but I know

he needs treatment and help for the -- because he suffered.
He was in foster care, over my objection.  Again, he got
abused instead of getting help.

I know my son needs help.  I know he can get it and be a
person he was before he started having all these problems.  He
is now 22.  He just turned 19 when this happened.  He was
still immature.  He can say mean things, but he's not a
monster.  He was wrong to contact her, and there is no excuse
for it, but please don't punish him for that.  He was let down
for a long time.  He was in solitary confinement where he
could only get out one hour a day.  That's punishment already.
I know he will not -- he will get more punishment, but please
send him to a place where he can get help.  I know jails are
bad places, but he has been treated like an animal and
threatened while he was there.

Judge, I ask you to give him ten years and let him get
treatment while he's in prison.  I know I may not be alive
when he is released, but he will be under court control when
he does.  He is a person that is capable of getting better.  I
love him and I know who he really is.  He is not the -- he is
not the act he puts on.  He is terrified and tries to act
tough, but he's really a child.  Thank you.

THE COURT:  Thank you, sir.

Candace.

MS. CROUSE:  Thank you, Judge.  Judge, I know that

you've read our Sentencing Memorandum, and I don't want to
reiterate everything that's in it but I do want to just point
out a few things for the record.

You know, Cody was 19 when this occurred. I know from
speaking to Cody and from speaking to the victim in this case
that there was a level of a caring relationship there. You
know, Cody now has spent over two years -- I think two years
and four months now he's been in pretrial detention, and
probably about a year of that, and this is as a result of some
of his own actions and we know this, but he's been on lockdown
23 hours a day without the ability really to have much human
contact. I think that's part of his reaching out and doing
some things that violated the Court order, which I know that
he's apologized for.

This case really has blown up and in a large part due to
some of the things that the victim said. I think she was
really brave for reaching out to me. She called me. We did
talk. You know, everything that Cody has pled guilty to is
true, and Cody has accepted responsibility for all of that,
but there were other things that were said that were not quite
true. She has set the record straight, at least with me in
person, about that and I think it was very brave of her to do
so.

I do appreciate some of the things that she said to the
probation officer when she was interviewed, that Cody is not a

monster, that they did have some good times. I know that she still cares about him. They have a child together. This is just an unfortunate situation.

You know, a lot of Cody's behavior can be explained by his difficult childhood, and I really commend the probation officer for laying that out. I saw Laura walking in here with records like this thick, very thick, Judge, from Cody's background. His foster care history, his juvenile history, Laura meticulously went through those and I think did a wonderful summary in the PSR about what happened to Cody as a child, and it's not pretty.

We look at the diagnosis, the psychological diagnosis that they had for him back then, and the treatment that they recommended that he never got. And then we had our psychologist examine Cody on two occasions. He came to a very similar conclusion, and it's been a general consensus across the board that Cody needs very specialized psychological treatment.

He's not going to get that in the Bureau of Prisons. I think there is a level of psychological treatment that he will get there, but it's not going to be what he needs.

And so when we're looking at punishment, there is a punishment element -- with a sentence, there is a punishment element and there is a rehabilitation element, and I think we need to think about when Cody is finally released, because he

1  will get released.

2     Now, granted, he is going to be on lifetime supervision.

3  That's part of the Plea Agreement, and that's a heavy, heavy

4  penalty as well, to be reporting on supervised release for

5  life.  But the Court is going to have some control over him in

6  that regard with regard to psychological counseling and

7  treatment, which is something that he wants.

8     Even Dr. Wygant said that Cody is aware, which is unusual

9  for his type of diagnosis, but he is aware that he has an

10  issue and that he needs treatment, and he wants treatment.

11     And so when we're looking at a sufficient but not greater

12  than necessary sentence in this case, we believe that the

13  ten-year mandatory minimum is sufficient but not greater than

14  necessary.  When he gets out, he will then be placed on

15  lifetime supervision, and this Court will be able to order

16  that he get the treatment that he needs.

17     Dr. Wygant has already spoken to Cody's dad, and he's

18  reached out to treatment providers in Wisconsin.  There is a

19  certain type of provider that is necessary to be able to give

20  Cody the treatment that he needs, and Dr. Wygant has already

21  looked into that.  So he'll be able to advise on where Cody

22  needs to seek treatment

23     So we would just ask the Court to consider all those

24  issues, his youth, his background, and the fact that this is

25  not just about punishment, this is also about rehabilitating a

young guy, a young kid, and we would ask that you consider the ten-year mandatory minimum.

THE COURT: Steve or Cody, anything you want to say?

MR. WENKE: I would just add to what Candace already said and just that, in my experience with him, I believe he's a deeply wounded person. I believe at this point he's broken, just seeing his reaction with his dad in here today. I think he's in a place where he will be receptive to treatment, and I would just reiterate what she's already said.

THE COURT: Okay. How about Cody, is he going to say anything?

MR. WENKE: I think he might.

THE DEFENDANT: Your Honor, I understand what I did was wrong, and I do regret that, and I do apologize to the Court and to her and her family for my actions. But also, I do, I do care about her a good amount. We have a son together who I'd really like to be able to be a father to. I had a pretty, like Candace said, difficult childhood. That has always affected me, I believe, to some point.

THE COURT: No. If you read paragraph 72 through about 87, I mean, it tugs at the heartstrings of any reader, Cody. I mean, what you went through, what you saw, what you felt, your experiences are not appropriate. Sadly, it's not unusual in presentence investigations to read a kid's history like this, so I've never -- I empathize with what you went

1  through, and I think it kind of explains how we got here to a

2  certain extent.  It's pretty sad and shocking stuff what

3  happened to you.  I get it.

4       THE DEFENDANT:  And one of the big things that -- I

5  mean, I have three children, one daughter and two boys, and I

6  don't want them to go through what I went through.  Me and the

7  victim's son, our son, is currently in foster care because of

8  the living situation that she was in and because of some of

9  the things that happened to her that weren't necessarily her

10 fault.

11      And when I reached out to her, that was one of the things

12 that I wanted to try to figure out, how I would be able to

13 help to prevent my son from going through the same things that

14 I went through when I was young.  And that's, that's a big

15 reason why I contacted her, and I guess the other part was

16 because I miss her.  You know, I mean, we have a son.  There

17 is always going to be an emotional connection, at least for

18 me, between me and her.  I just want to, any way that I could,

19 just try to be a good father.

20      THE COURT:  Okay.  I mean, oftentimes we see a cycle

21 that repeats itself and repeats itself.  When you read a

22 report like this, you can't help but sit here and wonder what

23 the kid is going to end up, what he's going to be like in ten

24 years.  It's a tough situation all the way around, not just

25 for you but also for the victim.  Anything else you think I

need to know at this time?

     THE DEFENDANT:  I just really want to apologize and ask you to consider the ten years so I can come home and get the help that I need.

     THE COURT:  Okay.

Anything else, guys?

     MS. CROUSE:  No.  Thank you, Your Honor.

     THE COURT:  Christy?

     MS. MUNCY:  Your Honor, I'll just be real blunt.  I don't believe anything he just said.  I don't believe he's sorry for his actions.  I believe he's sorry he got caught.  And the reason I say that is because of several things.

One is the conduct that he engaged in, attempting to manipulate the victim which led to the indictment of tampering with a witness.  Then after a lengthy period of time goes on and we negotiate a plea, which, quite frankly, is incredibly beneficial to him and speaks to the efforts made on his behalf by his counsel, he continues to do that.

So when he says I reached out to her to try to find out about my son and to make sure he's growing up okay, if that child grows up okay it will be because of nothing to do with Mr. Jackson and everything to do with the efforts that his very young and still-juvenile mother will do.

So when somebody stands up here and says it's his youth and he's broken and he's wounded -- what is this, the 28th of

February?  And in January of this year, through search
warrants that we had to obtain because of how he is trying to
contact the victim and use his father in an attempt to extort
her, he writes to his father:  And I swear to God, if you do,
I'll put you in the hospital on life support.  I will make
your life a real living hell.

That's who Mr. Jackson is, not the I'm sorry for what I
did.  It's very much I'm sorry I got caught.

He was in isolation because of that conduct.  It wasn't
because of some of his own actions, it was entirely because of
his actions that he was put in isolation.  And even when phone
restrictions were put on him after he most recently tried to
contact the victim, he is still using other inmates to try to
make contact.

It makes no sense to me.  It is beyond cavalier behavior.

That being said, his youth has worked in his favor in this
case because I know we can't put him in jail for the rest of
his life.  That, quite frankly, is the only way I think that
we can guaranty that Mr. Jackson would not commit a crime
again, but we can't.  But he has earned every day of a 15-year
sentence.  And supervision is not a punishment for
Mr. Jackson, it is protection to the community, and he
likewise has earned a lifetime of that.

With that said, Your Honor, I'm not going to repeat the
Sentencing Memorandum and the 3553(a) factors that are

outlined in there which I have briefly addressed, but I believe that he has earned the top end of the sentence and should be sentenced accordingly.

THE COURT: Anything else, guys?

MS. CROUSE: No, Your Honor.

THE COURT: Okay. As the lawyers know and as I think I previously informed Cody, it's my obligation to impose a sentence which is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. 3553.

I've already indicated that I think the sentence within the range of 120 to 180 months does accomplish that task.

So I have to look at the nature and circumstances of this offense, history, characteristics, and the potential for deterrence, not just for Cody but for perhaps other people that are similarly situated and maybe considering this type of conduct.

So based upon everything that's in front of me, I believe the appropriate term of incarceration is the sentence that was recommended by the Probation Department, which would be 165 months in the Bureau of Prisons, to be served concurrently with whatever --

As I understand it, the state sentence has not been imposed yet but it's been negotiated; is that correct?

MS. CROUSE: That's correct, Your Honor.

THE COURT: Okay. Also credit for time served as he

awaited disposition in this case.

As agreed upon in the 11(c)1(C) recommendation, the term of supervised release will be for a period of life, which means within 72 hours after Cody's release from the institution in which he's housed he'll report to the Probation Office in the district within which he is released or intends to reside, and he will give them all the information as required.

When he's on supervised release, he's not to commit any other federal, state or local crimes.

He is now a prohibited person, which means he is not allowed to own, use or possess a firearm, destructive device, ammunition or any type of dangerous weapon.

He is not allowed to unlawfully possess a controlled substance, and he will submit to at least one drug test within 15 days after his release from the institution, and at least two tests thereafter, and he'll provide the Probation Department with a DNA sample as he is directed.

He also is going to have to comply with the requirements of the Sex Offender Registration Act, which is known as SORNA, as directed by the probation officer, the Bureau of Prisons, as well as any state offender registration agency in which he ends up residing, working or being a student.

He must comply with all the standard terms and conditions of supervised release which have been adopted by this Court,

as well as the special conditions to make sure this
registration is kept current in each jurisdiction where he
resides.  That's not just a requirement of the jurisdiction
but also a requirement of supervised release.

If the supervision transfers to another federal district,
the obligation to register as required by SORNA will accompany
him into that jurisdiction and be governed by the district's
policy and the laws of that state.

He's not allowed to own, use, possess or view any sexually
explicit material as that term is defined in 18 U.S.C.
2256(2)(A) and (B).

He will participate in the sex offender treatment program
including risk assessment, psychosexual evaluation, or other
evaluations as determined appropriate by the Probation
Department.  He'll follow any rules and regulations of any
such treatment program that gets implemented by the Probation
Department, which will include signing all necessary
authorization forms to release confidential information which
would include polygraph examinations, computer access,
et cetera.

At the direction of the supervising officer, he will have
to take periodic polygraph examinations.  Those will occur at
his expense.

Because of the registration requirements in terms of
supervised release, he has to have his residence and

employment pre-approved by the probation officer and must be in compliance with any state and local laws.

He's not to have contact with any minor children, will not be permitted even with supervision unless approved by the Court.  A term of contact extends to forms of communication such as mail, other forms of electronic communication.  We're obviously not talking about people under the age of 18 that have jobs such as ticket holders, ticket vendors, cashiers, waiters and things like that

However, he is prohibited from loitering where minors congregate, areas such as playgrounds, arcades, amusement parks, sporting events, shopping malls, et cetera.

As directed by the Probation Department, he'll agree to and will be required to install any software that the Probation Department uses to monitor computer activities, and that will also occur at his own expense.  This software that's installed at that point in time may have the ability to record all activity on his computer, including the capturing of keystrokes and applicable information, e-mail and chat history, et cetera, et cetera.  He acknowledges there is no expectation of privacy regarding computer usage or information stored on the computer that he is using.

He has an obligation to warn others of the existence of the software program if they are attempting to contact him, and he is not allowed to remove, tamper with, alter or

circumvent in any way the software program.  If there's any

specific rules in the monitoring program, he has to comply

with those.

He has to surrender on request any media device to which

he has access to or control so that it can be searched by the

Probation Department based on reasonable suspicion or

contraband or evidence of a violation of a condition of

supervision.

This is not a situation where a fine is appropriate, but

there is a 100-dollar special assessment.  Since it's one

count, $100.  There was the possibility for an additional

$5,000-special assessment, but that's not going to be awarded

in this case.

So Barb?

COURTROOM DEPUTY:  There is a forfeiture.

MS. MUNCY:  Correct, Your Honor.  There was, I think,

a phone seized from Mr. Jackson.  If it's not in the

preliminary, we will get --

COURTROOM DEPUTY:  There has been one already issued.

It's Document 51.

THE COURT:  I can't recall.  Was that itemized in the

Plea Agreement then?

MS. MUNCY:  It was not in the Plea Agreement, Your

Honor.  He's already forfeited all property that was seized,

so we decided to do that in a preliminary order.

THE COURT:  All right.  So we will order that forfeiture to be implemented to the extent it hasn't already been done.

Anything else, then, Barb?

COURTROOM DEPUTY:  No.

THE COURT:  Laura, anything else?

OFFICER JENSEN:  Is the Court intending the no contact with the victim to continue?

THE COURT:  Oh, definitely, yeah.  Well, yeah.  I mean, he's going to be in the custody of the Bureau of Prisons for a period of time.  We can revisit --

Well, let me ask you.  Can I --

MS. MUNCY:  By the terms of the Plea Agreement, he is not permitted to have contact with her until she becomes an adult, which she is not.

THE COURT:  Okay, Until she's an adult.  I mean, I can't interfere with institution visiting rules and things like that.

MS. MUNCY:  That's a BOP issue.  They would be notified of that as well.

THE COURT:  And I'm expecting that at the time of his release there will be some type of assessment as to whatever relationship there may be at that time, which includes a minor child, so we'll have to talk about that down the road.

Is that all right?

1          OFFICER JENSEN:  Yes.

2          THE COURT:  Okay.  No contact with the victim while

3   she remains a minor.

4      Yes?

5          COURTROOM DEPUTY:  There was one other thing.  I

6   don't know if there was in the PSI still a recommendation for

7   a BOP facility?

8          MS. CROUSE:  I was going to raise that.  Judge, Cody

9   had asked if you would recommend either FCI Butner or FCI

10  Petersburg, if he qualifies.

11         THE COURT:  You want us to put it in either/or, or

12  how do you want to do that?

13         MS. CROUSE:  Butner is his first choice, and

14  Petersburg would be a second choice, if he qualifies.  They

15  both have sex offender programs.

16         THE COURT:  Okay.  That's fine.

17     I think the sentence is fair and reasonable under the

18  sentencing factors in 18 U.S.C. 3553, the materials contained

19  in the report, and Cody's actions in this case.

20     However, if there are any objections that need to be

21  placed on the record before I advise him of his notice of

22  appeal, do you guys want to do that?

23         MS. CROUSE:  No objections, Judge.

24         THE COURT:  Cody, as you sit here today, if you wish

25  to appeal the sentence and you indicate on the record that you

do, then Miss Crum, who is the courtroom deputy, will start the paperworking process with the Sixth Circuit Court of Appeals. They would appoint somebody to represent you in that regard and undertake that appeal.

If you're not sure as you sit here today what your choice is, you've got 14 days to have a conversation with Candace and Steve to decide how you wish to proceed in that regard.

So from that table, are there any thoughts about today?

MS. CROUSE: Well, Your Honor, there is an appeal waiver in the Plea Agreement.

THE COURT: There are certain rights that can never be --

MS. CROUSE: Right. If Cody wants to appeal, we will be sure to perfect that appeal timely.

THE COURT: Okay. So will you make sure you have contact with him at some point within 14 days to protect his interests in that regard if he wishes to appeal the sentence?

MS. CROUSE: Yes, Your Honor.

THE COURT: All right. I think I said credit for time served, right?

COURTROOM DEPUTY: You did.

THE COURT: And then you guys are going to handle -- somebody is going to handle how the state court, all that stuff occurs, right?

MS. CROUSE: Yes. You talked to --

1    MR. WENKE:  I've notified him.  I've not spoken with

2  him.

3    MS. CROUSE:  It's our understanding that the lawyer

4  that is working on the state court case has already been in

5  touch with the state prosecutors and is going to be handling

6  --

7    THE DEFENDANT:  Supposed to be in March.

8    MS. CROUSE:  End of March.  I think one of the

9  prosecutors is in trial right now.

10    THE COURT:  Okay.  That sentence will be imposed

11  concurrently, correct?

12    MS. CROUSE:  Correct.

13    THE COURT:  Anything else then, guys?

14    MS. CROUSE:  No, Your Honor.

15    THE COURT:  All right.  That's the order of the

16  Court.  Thank you.

17    MS. MUNCY:  Thank you, Your Honor.

18    COURTROOM DEPUTY:  Court is now adjourned.

19  (The proceedings concluded at 3:35 p.m.)

20

21              C E R T I F I C A T E

22    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

23  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

24  /s/Maryann T. Maffia     March 27, 2023 _ _

25  Maryann T. Maffia, RDR
   Official Court Reporter